176 So.2d 413 (1965)
248 La. 16
Metz LEE
v.
J. W. SMITH, Jr.
Nos. 47210, 47213.
Supreme Court of Louisiana.
January 18, 1965.
On Rehearing June 7, 1965.
*414 Ponder & Ponder, L. B. Ponder, Jr., Amite, for applicant in No. 47210.
Watson, Blanche, Wilson, Posner & Thibaut, David W. Robinson, Baton Rouge, for applicant in No. 47213.
David W. Robinson, Watson, Blanche, Wilson, Posner & Thibaut, Baton Rouge, Schilling & Simpson, Edwin C. Schilling, Jr., Amite, for respondents in No. 47210.
Ponder & Ponder, L. B. Ponder, Jr., Schilling & Simpson, Edwin C. Schilling, Jr., Amite, for respondents in No. 47213.
SUMMERS, Justice.
Metz Lee, who was employed by J. W. Smith, Jr., brought this suit against his employer for workmen's compensation. His claim was for total disability resulting from injuries received in the course and scope of his employment on November 18, 1958, while unloading logs from a truck at the *415 employer's sawmill. He further prayed for medical expenses, penalties and attorney's fees.
Smith in his answer alleged that he had advanced the sum of $3,955 to Lee pending the outcome and settlement of a law suit against Key Life Insurance Company for compensation benefits for the temporary disability sustained by Lee, that Lee's present disability was not related to the injury he received in the course and scope of his employment but was due to another injury he received when he fell in a boat on a fishing trip.
Smith then assumed the position of third party plaintiff and named Key Life Insurance Company as third party defendant alleging that in the event there should be judgment against him in favor of Lee, then, under the policy issued by Key Life Insurance Company covering injuries to his employees, he was entitled to recover for the injuries incurred by Lee to the extent of $2,000, the full amount due under the policy, plus $1,000.00 medical, or a total of $3,000.00, less a credit for $616.90 already paid, together with double indemnity and attorney's fees. The reply of Key Life Insurance Company as third party defendant was that the policy it issued was not workmen's compensation insurance, but accident insurance, and furthermore the policy had lapsed for nonpayment of premiums.
Later Smith amended his answer to Lee's suit for workmen's compensation alleging that Lee's recovery was barred under LSA-R.S. 23:1081 because of Lee's wilful and deliberate failure to use a fork lift in unloading the logs, which was a safety device provided for his protection.
The trial court awarded judgment in favor of Lee against Smith for workmen's compensation for total and permanent disability, less a credit for $3,955.00 representing the payment of compensation for 113 weeks; for medical expenses in the sum of $1,251.90; interest; penalties; attorney's fees in the amount of $500.00 and costs. The claim on the policy of insurance asserted by Smith as third party plaintiff against Key Life Insurance Company as third party defendant was denied.
Smith appealed from this judgment and Lee answered the appeal seeking an increase in attorney's fees only. Insofar as Lee is concerned, therefore, there can be no question of an increase of any award except attorney's fees.
The court of appeal affirmed the award of compensation and medical expenses, holding that the defense of deliberate failure to use a safeguard was "not supported by the evidence", but disallowed the award of penalties and attorney's fees, being of the opinion that the issue raised was of such "serious import" the employee Lee was not entitled to those items. The trial court's judgment denying the third party claim against Key Life Insurance Company was affirmed. See 162 So.2d 64.
We granted certiorari upon the application of Smith to review the adverse judgment, and we also granted certiorari upon the application of Lee on the question of penalties and attorney's fees. See 246 La. 90, 163 So.2d 361 (1964)
About 5:30 on the afternoon of November 18, 1958, Lee and Eldon Sibley, both employed by Smith, returned to the sawmill owned and operated by Smith with a truck-load of logs. They pulled into the yard of the mill and, after parking, Sibley went to get a "fork lift" tractor to aid in unloading the truck. This unloading operation consisted simply of removing the logs from the truck and dumping them into the mill yard. Lee, while awaiting the arrival of the fork lift, unhooked two of the binder chains holding the logs in place on the truck. When the third or last chain was loosened logs fell from the truck striking Lee, causing him permanent and disabling injury.
The section of the Workmen's Compensation Act upon which Smith relies to defeat Lee's claim (LSA-R.S. 23:1081) provides that, "No compensation shall be allowed *416 for an injury caused * * * by the injured employee's deliberate failure to use an adequate guard or protection against accident provided for him."
The fork lift is the device which Smith claims is a "guard or protection" against accident provided for his employees. As such, Smith contends, it was to be brought up to the side of the loaded log truck to serve as a holding device in order that the logs could not roll off the truck while the chains were being unfastened. Thus the fork lift, by retaining the logs, prevented their falling and enabled the worker handling the chains to escape injury. But we are of the opinion that this fork lift, a $20,000.00 machine, used extensively throughout the sawmill operation to move logs and lumber, by "unloading the log trucks, stacking lumber, putting logs on the ramp, loading lumber on trucks, taking lumber to the lumber yard and pushing saw-dust", was not provided as a guard or protection for employees but was a machine used in the overall operations at the saw-mill. Though available at the time, the fork lift was often not available for unloading log trucks and, therefore, on such occasions, the unloading operation was done with a crane or even by hand. For these reasons it could hardly be considered as a guard or protection provided for the protection of employees in the sense in which those terms are used in the compensation act.
The evidence further fails to make it clear that the employer had established a clear set of rules and instructed Lee concerning the use of the fork lift in the unloading operation. Nor had Lee been convinced of the effectiveness of the fork lift as a safety device for he testified, convincingly, that when the logs were stacked high enough on the truck it was possible for them to roll over the retaining braces on the fork lift and onto the operator of the fork lift or persons located nearby. In Lee's mind, at least, the fork lift was not an adequate guard against danger from the higher logs. And the record fails to establish that his misgivings about the fork lift were unfounded, or that it was generally known among the employees that the fork lift was always to be used as the employer contends.
The evidence shows, too, that the fork lift had a use in connection with the unloading operation unrelated to its use as a guard or protection. When the chains holding the logs in place were unfastened, some of the logs would sometimes fall from the truck, sometimes none would fall. In either instance the fork lift was used to push the remaining logs off the truck and, when it was used, it was used for this purpose. When the fork lift was not used the logs were unloaded by a crane or by hand. The record therefore fails to convincingly establish that the fork lift was to be used by Lee or others solely as a guard or protection against falling logs when the chains were being unfastened.
When an employer invokes the defense that the injured employee deliberately failed to use an adequate guard or protection against accident provided for him, the employer bears the burden of proving that the safety device was provided as such, that the employee had knowledge of its function and adequacy and deliberately failed to use it. In the instant case this requirement has not been met.
In the interpretation of LSA-R.S. 23:1081 the courts of our State have required that the guard or protection be furnished primarily for the purpose of safety. Such an interpretation is found in Brown v. Kansas City Bridge Company, 191 So. 755 (La.App.1939) where the employee placed himself outside a guard rail on a cement barge in his effort to pry loose a bag of cement from the barge. The principal purpose of the rail was to hold the cargo. Secondarily, it served as a protection to persons working on the barge to keep them from falling overboard. Citing the requirement in the statute that the guard or protection *417 against accident be provided, the court held that the guard or protection referred to "contemplates something which is provided by the employer principally as a safety or protection to the employee, and not that which is placed on the premises * * * and whose principal purpose is to facilitate or expedite the work." Similarly, in Haven v. Munson, 169 So. 819 (La.App. 1936), where an employee had removed a hopper from a cotton ginning machine and his hand was mangled by the gin, the court, responding to the same defense raised in the instant case, said: "The hopper or barrier which plaintiff removed was not there solely as a protection to employees, but served to form part of the gin as well."
This rule was sanctioned in Daigle v. Moody, 175 La. 853, 144 So. 596 (1932), where it was noted:
"Defendant had boats for the purpose of transporting the employees from the barge across the river, and, when it became necessary to change the position of the anchor, the employees would be conveyed across the river in these boats, and, when the anchor had been changed, the boats would convey them back to the barge."
Satisfied that the boats were provided primarily for the safety of the employees, recovery was denied under the statute to the mother of a young employee who drowned when he chose to swim across the river rather than use the boat available for crossing the river safely.
To the same effect is the court's ruling in Carter v. Christ, 148 So. 714 (La.App. 1933) when an employee, while engaged in painting the side of an office building, fell to the ground from the suspended scaffold on which he had been working, and died as a result of the fall. Noting that the deceased had failed to use the safety line provided exclusively for his protection, the court denied recovery to his survivors because the deceased had deliberately failed to use a safeguard provided for him. See also Cole v. List & Weatherly Const. Co., 156 So. 88 (La.App.1934); Malone, Louisiana Workmen's Compensation Law and Practice, Sec. 343 (1951 ed.); 58 Am.Jur., Workmen's Compensation, Sec. 206.
These rules are particularly pertinent to the case at bar for it is apparent that the fork lift was not provided primarily as a guard or protection against accident to employees; and the evidence does not satisfactorily establish that Lee was made aware that the fork lift was to be used as a guard or protection. Under these circumstances we cannot hold that the employee's actions constitute a deliberate refusal to use a guard or protection when the evidence does not satisfy us that the fork lift was furnished primarily for that purpose or that the employee was aware of its function and adequacy or had been properly instructed in its use. And, too, "[t]he word `deliberate' as used in the act implies something more than mere negligence, or a voluntary and intentional failure on the part of the workman to use the guard or protection. The word carries with it an implication of some obstinacy, headstrongness, foolish daring, or intentional wrongdoing on the part of the employee." Brown v. Kansas City Bridge Company, supra. See also McClendon v. Louisiana Central Lumber Company, 17 La.App. 246, 135 So. 754 (1931). There is no direct proof to the effect, and it would be difficult to infer, that the employee's failure to use the fork lift was due to obstinacy, headstrongness, foolish daring or like conduct. We cannot, therefore, permit the employer's defense to succeed.
Statutory penalties and attorney's fees are claimed under the authority of LSA-R.S. 23:1201.2. That statute reads in part:
"Any such employer who at any time discontinues payment of claims due and arising under the provisions of this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the penalties set forth above, payable to the claimant, together with all reasonable *418 attorney's fees for the prosecution and collection of such claims."
Whether the discontinuance of compensation payments is arbitrary, capricious, or without probable cause depends primarily upon the facts existing and known to the employer at the time the payments were stopped. We find that the payments were discontinued because the employer, by his own proof, showed that he was financially unable to continue them. Further, his pleadings show that at the time suit was filed his defense was predicated upon the premise that the employee's original injury had healed and the injury the employee then complained of was the result of an accident sustained on a fishing trip. This defense was totally without merit factually; there was not one iota of evidence to sustain it. Surely, at this point, the employer's action was arbitrary and capricious for he had no valid cause for discontinuing compensation payments. It was more than a year later, four days before the trial, when the employer filed a supplemental answer urging for the first time the defense of failure to use a guard or protection. We agree with the court of appeal that this latter defense provided a questionable issue factually. Had this defense been the basis for the discontinuance of payments, we would be inclined to agree with the court of appeal that the issue was serious enough to permit a finding that the employer's action in discontinuing payments and seeking a judicial determination of his defense was reasonable and not arbitrary, capricious or without probable cause. But, as we have seen, the record does not support a finding that the discontinuance of compensation payments was based upon that defense. When the employer discontinued payments he was unaware of the fact that his actions might be justified because of the employee's failure to use a safety device. Hence, this latter defense is a belated one, not relied upon by the employer as a basis for discontinuing payments or, initially, as a defense in the suit for compensation. This defense was developed later while the suit for compensation was pending, and it cannot convert the employer's former arbitrary and capricious action into reasonable conduct.
The employer's conduct must be judged on the facts as they appear at the time payments were discontinued and those facts must justify the discontinuance. Buffalo Ins. Co. v. Bommarito, 42 F.2d 53, 70 A.L.R. 1211 (8th Cir. 1930).
For these reasons, the trial court judgment awarding penalties and attorney's fees is sustained. However, although the award by the trial court of $500.00 for attorney's fees may have been adequate at that stage of the proceeding, that amount does not represent reasonable compensation for pursuing this matter through the court of appeal and this court. Accordingly, the judgment of the trial court is amended to increase the attorney's fees to $1,500.00.
The remaining issue involves Smith's third party demand against Key Life Insurance Company. The policy sued upon covers accidental injury to employees with stated benefits. It is not workmen's compensation insurance. The only substantial question presented involves whether the policy had lapsed for nonpayment of premiums at the time of the employee's injury on November 18, 1958.
The policy provided that the initial premiums based upon the employer's payroll covered a four-week period and that the policy could be renewed thereafter for like four-week periods upon timely payment of the determined premium.
The inception date of the policy was August 8, 1958, at which time the initial premium was paid maintaining the insurance in effect until August 30, 1958. Another premium payment made on September 17, 1958, was accepted and the policy was thereby maintained until September 27, 1958. The last payment, made on November 21, 1958, and accepted by the company, was applied retroactively to maintain the *419 policy for four weeks after September 27, 1958, or until October 25, 1958. No other premiums were paid on this policy, but another application was submitted and a second policy was issued with December 5, 1958, as its inception date. The first policy, then, terminated on October 25, 1958, for nonpayment of premiums and was not in force on November 18, 1958, when the employee was injured.
Smith contends, however, that the policy provided for annual audits to determine the sufficiency or insufficiency of premiums which had been paid and for a settlement between the insurer and the insured based upon the audit. Such an audit revealed that he had overpaid the premiums on the first policy to the extent of $99.15. If this overpayment had been applied to the payment of premiums on the first policy, he argues, it would have extended the coverage beyond November 18, 1958. The result would be that the injury to the employee on that date would be within the policy coverage.[1]
This contention is without merit for there is no provision in the policy permitting the Key Life Insurance Company to apply these overpayments to premiums. The policy provisions make this conclusion abundantly clear.
"The required premium is based on a percentage of the total payroll of the Employer and therefore the deposit paid in advance is based on an estimated payroll. On each policy anniversary the actual payroll of the Employer shall be compared to the estimated payroll and thereby a determination of the actual premiums paid and the premiums required hereon for the preceding policy year, and a settlement thereon between the Employer and the Company shall be made at said time."
Therefore, when the policy terminated for nonpayment of premiums and the audit was made showing an overpayment of premiums, it was required by the foregoing stipulation in the policy that the company make a settlement with the employer. This was done by issuing a check to Smith for the overpayment. Smith retained the check and negotiated it. His position that this overpayment of premiums should have been applied to premium payments is unfounded. As we view the quoted language of the policy, the company was without authority to apply the overpayment to premiums but, on the contrary, it was obliged to settle with Smith for the amount due to him as determined by the audit.
The result is that the policy was not in effect on November 18, 1958, the date of the injury to the employee, and there can be no recovery thereon for injuries on that date.
Accordingly, the judgment of the court of appeal is amended to cast defendant, J. W. Smith, Jr., with 12 percent penalties on all payments which were past due and unpaid on the date of the trial court judgment, together with attorney's fees in the sum of $1,500.00 and, as amended, the judgment and decree appealed from is affirmed.
HAMITER, J., is of the opinion that the decision of the Court of Appeal is correct.

ON REHEARING
FOURNET, Chief Justice.
We granted this rehearing on the application of the defendant, J. W. Smith, Jr., but limited it "to the question of whether the financial inability of the employer to pay workmen's compensation is a sound basis for denying penalties and attorneys' fees" in such cases.
As pointed out in our original opinion, the question of whether an employer *420 is justified in discontinuing compensation payments depends primarily upon the facts as they existed and were known to him at the time he ceased making such payments. However, the issue to which this rehearing was limited was never raised in any of the pleadings filed by Smith, nor can it be said to have been raised through the enlargement of the pleadings by the testimony. In fact, it was not even urged in argument of counsel representing him or in the application for rehearing.
Actually, Smith, in his answer, took the position he was justified in discontinuing these compensation payments for the reason that Lee had fully recovered from the injury suffered during the course of his employment, and any disability existing at the time the suit was filed was caused by a fishing accident. Some 14 months later, in a supplemental and amended answer, Smith pleaded "as an additional defense" that Lee was not entitled to compensation because he willfully and deliberately failed to use a safety device Smith procured for his protection, and also to comply with safety rules and regulations.
If Smith intended to claim financial inability to pay Lee, it does not seem reasonable that he would have testified on the trial he still intended to pay the note he gave the physician treating Lee despite his inability to collect this amount from the company issuing him an accident policy because he had, unfortunately, permitted it to lapse. Furthermore, the record shows the safety device referred to in the pleadings was purchased by Smith for some $21,000, and that he furnished personal bond of $18,000 in this case, which was in excess of the maximum amount due Lee as compensation.
Inasmuch, therefore, as the record clearly reflects Smith's discontinuance of the compensation payments to Lee was not due to financial inability to meet this obligation, and no showing was made that he was financially unable to do so, we find it unnecessary to pass on the abstract question to which this rehearing was limited, i. e., whether an employer's inability to pay an injured workman compensation is a sound basis for refusing to award penalties and attorney fees to the workman compelled to resort to legal action to secure such payments.
For the reasons assigned, our judgment and decree on original hearing are reinstated.
HAMITER, J., concurs.
NOTES
[1] According to the calculations of the witness for Key Life Insurance Company the application of this overpayment to premiums would not have extended the policy coverage to include November 18, 1958, but the extension would have fallen several days short of that date.