543 So.2d 1365 (1989)
Clarence WILLS, Plaintiff-Appellant,
v.
SOLIDA CONSTRUCTION CO., et al., Defendants-Appellees.
No. 20,341-CA.
Court of Appeal of Louisiana, Second Circuit.
May 10, 1989.
*1366 Patricia N. Miramon, Shreveport, for plaintiff-appellant, Clarence Wills.
Cook, Yancey, King & Galloway by Timothy B. Burnham, Shreveport, for defendants-appellees, Solida Const. Co. and Hartford Accident & Indem. Co.
Before MARVIN, SEXTON and NORRIS, JJ.
SEXTON, Judge.
The plaintiff, Clarence Wills, appeals the trial court judgment dismissing his worker's compensation claim against the defendants, Solida Construction Company (Solida) and its worker's compensation insurer, Hartford Accident and Indemnity Company. We reverse.
The plaintiff, who was 47 years old at the time of the accident, injured his back on August 12, 1985 while working for Solida when he fell approximately eight to nine feet from the top of a concrete spreader. He saw Dr. Albert H. Powell, a general practitioner, the day after the accident complaining of low back pain. Dr. Powell diagnosed a severe myoligamental strain to the paraspinal muscles in the lumbosacral region. He prescribed medication for the *1367 pain and a back brace for extra support and told Wills to come in for sonicative muscle stimulation treatments. The plaintiff saw Dr. Powell on a regular basis during the four weeks after the accident.
Dr. Powell then referred Wills to Dr. M. Ragan Green, Jr., an orthopedist, who first saw him on September 19, 1985. Dr. Green noted tenderness in the lumbosacral area. The straight leg raising test produced some back pain but no radicular pain. X-rays showed no evidence of bony abnormality. Dr. Green diagnosed lumbosacral strain. He prescribed anti-inflammatory medication, rest, and exercise. Dr. Green also referred him to Larsen Physical Therapy, Inc.
On October 17, 1985 he saw Dr. Green again with the same complaints. Dr. Green noted that he could not find any significant objective data to support the patient's complaints of pain and discharged him.
On November 4, 1985, the plaintiff saw Dr. Baer I. Rambach, an orthopedist, at the request of Hartford. Dr. Rambach's examination revealed that the plaintiff could heel and toe walk without any difficulty, his spine was straight, there was tenderness in the region of L1-L2, there was a full range of motion of the lumbosacral spine without pain, pelvic flexion was painful, and there was no motor or sensory deficit in the lower extremities. Dr. Rambach took x-rays which showed no fracture or dislocation or any other results of trauma. His opinion was that the plaintiff had sustained myoligamentous strains and contusions to the lumbosacral region of the spine at the time of the accident. Dr. Rambach did not find any indication of any mechanical nerve root compression suggestive of an intevertebral disc injury.
On February 17, 1986, plaintiff consulted Dr. Jose D. Pineda, a family practitioner. He complained of lower back and leg pains. The physical examination revealed that flexing and extending the back were limited due to extreme pain. Heel and toe walking provoked pain. There was pain and spasm in the sacrolumbar area. He was given a course of electrophysiotherapy and analgesics. On February 18, 1986 he went to LSU Medical Center with complaints of back pain radiating down his right leg. He returned to Dr. Pineda on March 14, 1986. His symptoms were the same. Dr. Pineda referred him to Dr. Christopher D. Burda, a rheumatologist.
On March 18, 1986 he saw Dr. Burda who concluded that the plaintiff's history and physical findings were consistent with traumatic fibrositis or chronic myoligamentous strain of the thoracic and lumbosacral spine as a result of the accident that occurred in August 1985. He prescribed medication and told plaintiff to continue physical therapy and electrotherapy.
He returned to Dr. Pineda on two more occasions in March 1986. His condition was unchanged, and Dr. Pineda diagnosed him as having an unresolved traumatic strain and sprain of the thoracolumbar and sacrolumbar area with recurrent and chronic episodes of fibrositis of the myoligamentous group. As a result of these findings, Dr. Pineda concluded that the plaintiff was not able to engage in any physical activity which may require the use of the injured areas.
He saw Dr. Burda again on April 7, 1986. His condition was essentially the same. Dr. Burda believed that he was unable to return to his prior gainful activity. He was told to continue his medication and physical therapy.
On June 10, 1986 he saw Dr. Rambach for the second time. He told Dr. Rambach that he was continuing to have pain in his back and neck and that most of the pain was in the center of his back and radiated down both hips and legs. Dr. Rambach found no muscles spasms. The plaintiff had a good range of motion in the lumbosacral spine. Dr. Rambach took x-rays of the dorsal and lumbosacral spine. They showed no evidence of fractures or dislocations or any other trauma. His opinion was that the plaintiff suffered a muscle and ligamentous strain and contusions to the lumbosacral region of the spine at the time of the accident. He could not find any objective physical findings to substantiate the continuation of his complaints.
*1368 He saw Dr. Burda on the same day that he saw Dr. Rambach. Dr. Burda found the plaintiff to be in essentially the same condition as on the last visit. On a subsequent visit, Dr. Burda referred the plaintiff to Dr. Phillip Osborne, a pain specialist. The record is unclear as to when Dr. Osborne examined the plaintiff. However, there is a letter report from Dr. Osborne dated September 9, 1986, the same day that plaintiff underwent significant back surgery, in which Dr. Osborne stated that he believed the plaintiff was grossly exaggerating his complaints.
On July 26, 1986, he saw Dr. Marco A. Ramos, a neurosurgeon. The plaintiff told Dr. Ramos that he was experiencing low back pain which radiated down his right leg and pain in his right shoulder. Dr. Ramos found limitation in the range of motion of the lumbosacral spine, some tenderness of the paravertebral muscle groups, and some diminished sensation. Dr. Ramos concluded that he had a chronic mild lumbosacral strain.
He saw Dr. Ramos again on August 26, 1986. Dr. Ramos hospitalized him for conservative treatment. A lumbar myelogram revealed a mild bulging disc at the level of L4-L5 and a ventral epidural defect at the level of L2-L3. From the myelogram, Dr. Ramos learned that the plaintiff had a narrowing of the spinal canal. A CT scan revealed that the ventral defect was caused by a disc defect pressing on the subarachnoid space.
Dr. Don K. Joffrion, an orthopedist, examined the plaintiff on September 1 and 3, 1986. After reviewing the myelogram and the CT scan, he concluded that there was a significant lesion at L2-L3. He recommended surgery if conservative treatment was unsuccessful. Conservative treatment was unsuccessful, and surgery was performed on September 9, 1986 by Drs. Ramos and Joffrion to stabilize the plaintiff's spine.
The plaintiff was discharged from the hospital on September 18, 1986. By December 11, 1986, it was clear to Dr. Ramos and Dr. Joffrion that he was not progressing as well as they had expected. Dr. Ramos requested a magnetic resonance imaging, or MRI, of the lumbosacral area. The MRI showed decreased disc space height at the L4-L5 level and central bulging at the L3-L4, L4-L5 and L5-S1 levels. Another MRI was done on January 6, 1987 at the request of Dr. Ramos. It revealed post-operative changes at L4, L5, and S1. There was a small herniated disc at the level of L2-L3 and a bulging disc at the level of L4-L5 associated with degenerative changes of the disc. Dr. Ramos and Dr. Joffrion concluded that further surgery was necessary.
The plaintiff saw Dr. Ramos in January, February, March and April of 1987. He continued to complain of low back pain radiating into his leg. In May 1987 he saw Dr. Craig R. Springmeyer, an orthopedist. Dr. Springmeyer concluded that he is disabled from carrying on any gainful employment. The plaintiff saw Dr. Ramos in June, August and October of 1987. His low back pain persisted. At his deposition in November 1987, Dr. Ramos stated that the plaintiff is in need of future surgery, specifically a foraminotomy which is a lumbar re-exploration for the decompression of the nerve roots. Because his spinal canal is very narrow, he will also need fusion for stability.
The plaintiff received worker's compensation benefits from August 12, 1985, the date of the accident, until November 12, 1985 after Dr. Powell released him to return to light duty work. The plaintiff then applied for and received unemployment compensation benefits. He certified in his application that he was able to return to work. He testified that he would have accepted a job if one had been offered. He received these benefits for twelve weeks.
This action for worker's compensation benefits ensued. At trial, the parties stipulated that the plaintiff was injured in an accident arising out of and in the course of his employment and that at the time of trial the plaintiff was not able to engage in gainful employment because of his physical condition. They further stipulated that the plaintiff was temporarily and totally disabled at that time. However, the defendants *1369 disputed that the plaintiff's present condition was caused by the August 1985 accident. Thus, the main issue at trial was whether plaintiff's present condition was caused by the on-the-job accident.
The trial court found in favor of the defendants. The court found that it was as reasonable to relate the disc injury to the prior back problem as it was to relate it to the on-the-job accident. The court also found that because competent medical evidence established that there was no disc problem in June 1986, it was reasonable to conclude something happened between that date and the date that Dr. Ramos detected the disc problem.
The plaintiff appealed. He argues that the presumption of a causal connection was not rebutted by defendants' evidence that the plaintiff may have had a prior back injury or that Dr. Rambach did not find evidence of a disc problem in June 1986. The plaintiff argues that even if he did have a pre-existing condition, he is entitled to worker's compensation even if he aggravates that pre-existing condition. The plaintiff also points out that Dr. Rambach was hired by the defendants, and he used only x-rays in his examination, rather than more sophisticated procedures.
The defendants contend that the presumption of a causal connection does not apply in this case because the symptoms of a herniated disc were not immediately or continuously manifested after the accident. They contend the first symptoms of a possible herniated disc weren't recorded until February 1986.
The claimant in a worker's compensation suit has the burden of proving by a reasonable preponderance of the evidence that the disabling injury was caused by the accident. Allor v. Belden Corporation, 393 So.2d 1233 (La.1981); Bamburg v. Riley-Beaird, Inc., 305 So.2d 551 (La.App. 2d Cir.1974). It is not necessary for the experts to determine the exact cause of the disability in order for the claimant to recover. Allor v. Belden Corporation, supra. In certain circumstances, the claimant is entitled to the benefit of a presumption that there is a causal connection between the accident and the disability.
A plaintiff's disability will be presumed to have resulted from an employment accident if the plaintiff was in good health before the accident, but commencing with the accident the symptoms of the disabling condition appear and manifest themselves continuously afterwards, provided that there is some reasonable possibility of a causal connection between the accident and the disabling condition.
Droddy v. Cliff's Drilling, Inc., 471 So.2d 223, 225 (La.1985).
The defendants argue that the presumption does not apply because the plaintiff was not "an otherwise healthy worker" before the August 1985 accident. In this regard, the defendants rely on records from the LSU Medical Center showing that the plaintiff had been treated on May 12, 1984 for shoulder pain and on December 7, 1977 for back and leg pain that he experienced after an automobile accident earlier that year.
According to the defendants, the lack of complaints or findings of pain in the legs in 1985 are not consistent with findings of a protruded disc in 1986. The defendants argue that because there were no complaints of leg pain, neither Dr. Green nor Dr. Rambach saw a need in 1985 to do a myelogram or magnetic resonance imaging.
The fact that the plaintiff may not have communicated to Drs. Rambach and Green that he was having leg pain does not mean that he did not have the disc injury at the time that he saw these doctors. There is significant medical testimony establishing a reasonable possibility of such a connection. The plaintiff experienced back pain immediately after the accident and continuously thereafter. He sought medical attention the day after the accident and on a regular basis up until the date of the trial. Dr. Ramos stated that a ruptured disc at the L2-L3 level can be missed very easily. Dr. Joffrion echoed Dr. Ramos's assertion that the type of disc problem that the defendant had is difficult to find. He noted that the *1370 defect was a ventral defect which he explained "is midline instead of being right or left." A ventral defect is more difficult to detect upon examination and on an x-ray. A ventral defect causes fewer definite symptoms than a lateral defect that presses a single nerve root. As a result, it is more difficult to diagnose. In addition, ventral defects above L3 are not very common.
The defendants are correct in their assertion that Dr. Joffrion did not have an opinion about what caused the plaintiff's condition. He stated that the ventral defect could have resulted from trauma or from natural degeneration over time. However, Dr. Ramos did state that the injury could have been caused by the accident. While Dr. Joffrion could not definitely state that the present injury was caused by the accident as opposed to natural degeneration, the fact remains that his testimony and that of Dr. Ramos establishes that there was a reasonable possibility that there was a causal connection. Under these circumstances, plaintiff is entitled to the presumption articulated in Droddy v. Cliff's Drilling, Inc., supra. The burden thus shifts to the defendants to prove that the plaintiff's disability was caused by something other than the work-related injury. Droddy v. Cliff's Drilling, Inc., supra.
Simply stated, the circumstances show a plaintiff who may or may not have had a previous back injury. At the time of the accident complained of, the plaintiff was not under treatment for any back problems and had not been for a significant period of time. There was no evidence of ongoing medical treatment at the time of the accident. This was a significant accident, a fall of eight to nine feet. He was immediately symptomatic and he consistently complained of back problems until the diagnosis and operation. Competent experts testified that the condition they found was not only consistent with the plaintiff's complaints and trauma, but was also difficult to diagnose. Further, there is no evidence of an intervening event which could have caused the plaintiff's current condition. The plaintiff is thus legally temporarily totally disabled.

AMOUNT OF BENEFITS
The parties stipulated that the plaintiff received worker's compensation benefits of $248 for thirteen weeks and then unemployment compensation benefits of $116 a week for twelve weeks. The extent of the credit due defendants, however, is in dispute. The plaintiff asserts that the defendants are entitled to a credit of only $2,900, which represents the total dollar amount received of both worker's compensation and unemployment benefits. The defendants argue that the plaintiff is not entitled to any compensation for the period from August 12, 1985 through November 12, 1985 because the plaintiff received unemployment compensation benefits during this period. They contend that the wording of LSA-R.S. 23:1225 B precludes receiving worker's compensation benefits for any period in which a worker has received unemployment compensation benefits.
LSA-R.S. 23:1225 B provided at the time of the accident that
No compensation benefits shall be payable for temporary or permanent total disability or supplemental earnings benefits under this Chapter for any week in which the employee has received or is receiving unemployment compensation benefits....
This statute, indeed, plainly reads as contended by the defendants. Yet, in Green v. Jackson Rapid Delivery Service, Inc., 506 So.2d 1345 (La.App. 2d Cir.1987), this court apparently did not apply the credit as contended by defendants but, rather, allowed a simple dollar credit for the unemployment benefits received by the plaintiff. However, it does not appear that the specific contention that plaintiff was entitled to no benefits during the time he received unemployment compensation was made to the court.
In any case, the wording of the statute is clear. Moreover, we note that Malone and Johnson in their treatise on worker's compensation point out "that no compensation benefits ... shall be payable for any week *1371 in which the employee has received unemployment compensation benefits." 13 W. Malone & A. Johnson, Louisiana Civil Law Treatise, § 289, at 174 (Supp.1989). This interpretation has been followed by the Third Circuit. Young v. State Farm Fire & Casualty Co., 511 So.2d 15 (La.App. 3rd Cir.1987). To the extent that Green v. Jackson Rapid Delivery Service, Inc., supra, may be contrary to our decision on this point, we choose not to follow it.
Thus, the plaintiff is entitled to a lump sum judgment for the past due sums and for judgment for $248 a week thereafter as long as the disability continues. We calculate that 169 weeks are past due as of the date of this opinion, May 10, 1989.

PENALTIES AND ATTORNEY'S FEES
An employer shall be liable for penalties and attorney's fees for terminating benefits when its action is arbitrary, capricious or without probable cause. Whether a termination of benefits is arbitrary, capricious or without probable cause depends primarily on the facts known to the employer at the time of its action. LSA-R.S. 23:1201.2; Lee v. Smith, 248 La. 16, 176 So.2d 413 (1965); Harrison v. Chicago Mill & Lumber Co., 446 So.2d 843 (La.App. 2d Cir.1984). The question is one of fact, and the trial court's finding should not be disturbed on appeal absent manifest error. Harrison v. Chicago Mill & Lumber Co., supra.
At the time that the defendants terminated compensation on November 12, 1985, the plaintiff had been examined by Dr. Rambach on November 4, 1985. Dr. Rambach found no indication of a disc injury. On November 8, 1985, Dr. Powell released the plaintiff to light duty work. These facts establish a serious question as to the plaintiff's continuing disability beyond November 12, 1985. The termination of benefits is not arbitrary and capricious when it is based upon substantial bona fide factual contentions. Harrison v. Chicago Mill & Lumber Co., supra. We find that the plaintiff is not entitled to penalties and attorney's fees.

COMPENSATION OF ATTORNEYS FOR LEGAL SERVICES
Since the institution of this suit, the plaintiff has had numerous attorneys, some of whom have filed petitions of intervention to collect the fees for their services and to receive reimbursement of expenses. The worker's compensation law specifically provides that attorneys providing legal services arising under the worker's compensation statute have a privilege for their fee upon the compensation awarded. LSA-R.S. 23:1141 A.
After the plaintiff's first attorney withdrew from the case, the plaintiff hired attorney C. Don McNeill. After the plaintiff discharged Mr. McNeill, he hired James M. Johnson. When he discharged Mr. Johnson, he hired Patricia Miramon to represent him. Mr. McNeill, Mr. Johnson, and Ms. Miramon filed petitions of intervention for their fees and thus are entitled to a privilege for their fees on the plaintiff's compensation award.
Having established that these attorneys have a privilege on the plaintiff's compensation award, we next consider the extent of that privilege. Our research has not revealed any cases defining the extent of the privilege granted by LSA-R.S. 23:1141 A. The courts, however, have determined the extent of two other attorney fee privilege statutes. In Calk v. Highland Construction & Manufacturing, 376 So.2d 495 (La.1979), the Louisiana Supreme Court found that the word "fee" in LSA-R. S. 37:218[*] included
the agreed upon contingency fee, taxable court costs advanced by the attorney, and the attorney's necessary and reasonable expenses in pursuance of the litigation, such as those for investigation and travel. It does not include other advances which are in the nature of a loan, *1372 nor does it include the payment or reimbursement of expenses which, like medical bills, constitutes the client's special damages.
Calk v. Highland Construction & Manufacturing, supra at 500.
In Dusenbery v. Andras, 525 So.2d 682 (La.App. 1st Cir.1988), the court was called upon to determine the extent of the privilege for attorney's fees granted by LSA-R.S. 9:5001 to attorneys on all judgments obtained by them. The Dusenbery court followed Calk and determined that the privilege did not extend to the payment of a client's expenses for medical charges or physical therapy, and further did not extend to cover witness fees advanced. We will therefore recognize the privilege of these attorneys, but that privilege will be limited to the extent articulated by Calk v. Highland Construction & Manufacturing, supra, and Dusenbery v. Andras, supra.
In the data submitted by the three attorneys, the only charges that we noted that are subject to the privilege are their fees.
LSA-R.S. 23:1141 B limits attorney's fees in worker's compensation cases to 20 percent of the first ten thousand dollars of any award and ten percent of the part of any award in excess of ten thousand dollars. These attorneys are entitled to 20 percent of each payment up to the first ten thousand dollars received by the plaintiff. If the plaintiff receives more than ten thousand dollars, the attorneys are entitled to ten percent of that received in excess of ten thousand dollars.
There appears to be no disagreement among the attorneys about the time that each spent on the case. We will therefore evaluate the extent of the services of each of the three attorneys who have asserted a privilege for their fees herein and recognize the extent of their privilege as a proportionate value of the fee which the statute, LSA-R.S. 23:1141 B, allows. Mr. McNeill was employed by the plaintiff from February 20, 1986 until June 17, 1986 and asserted that he had spent 20 hours on the plaintiff's case. Mr. Johnson enrolled July 21, 1986 and withdrew April 10, 1987. Mr. Johnson asserted that he spent just over 18 ½ hours working on the case. His time sheets which he filed, however, do not quite equal that amount. They also show just under two hours spent on the plaintiff's claim for social security benefits. It thus appears that his total hours are just under 17. Ms. Miramon has essentially represented the plaintiff since August of 1987. She tried the case and has prosecuted this successful appeal. The trial court record indicates that she has just under 120 hours of work on the case, which, of course, does not include her time spent on the appeal.
Under these circumstances, we will recognize that Mr. McNeill has a privilege on twelve (12%) percent of the twenty (20%) percent (up to $10,000), and the ten (10%) percent (over $10,000) of the award which LSA-R.S. 23:1141 B allows for fees. Mr. Johnson's privilege will be similarly recognized to the extent of eight (8%) percent, and Ms. Miramon's will be recognized to the extent of eighty (80%) percent.

EXPERT WITNESS FEE OF DR. RICHARD FLICKER
The plaintiff contends that he is entitled to have an expert witness fee established for Dr. Richard Flicker. Dr. Flicker, an industrial psychologist, administered a series of aptitude tests to the plaintiff to determine his employability in light of his back condition. He testified that he would have a difficult, if not impossible, time finding a job at the present and in the future. At trial the defendants' attorney objected to the testimony of Dr. Flicker on the grounds that his testimony was not necessary or helpful to the district court in light of the joint stipulations in which the defendants admitted that, at the time of trial, the plaintiff was not able to engage in gainful employment because of his physical condition. The plaintiff argues that Dr. Flicker's testimony was necessary to establish that the petitioner was not qualified to do work of any kind from the date of the accident because of the nature of his injuries. In the joint stipulations, the defendants agreed that the plaintiff was disabled only from February 1986.
*1373 The trial judge allowed the testimony of Dr. Flicker subject to the objection of the defendants. The trial judge stated that if after hearing the testimony he determined it to be inappropriate because of the stipulation, he would so rule. After hearing the testimony, the trial judge did not make a ruling on its appropriateness. Under these circumstances, since the trial judge allowed the evidence, even though subject to the objection, we are inclined to the view that the trial court determined that the testimony was appropriate.
We are inclined to agree that the testimony was helpful. It is our appreciation of the record that, although the defendants stipulated at trial that the plaintiff was totally temporarily disabled at that time, they had not agreed that the plaintiff was disabled between the time benefits were terminated and trial. Thus, the testimony was pertinent to this question. We deem $500 to be a reasonable expert witness fee under the circumstances of this record.

MEDICAL EXPENSES
The parties entered into a joint stipulation which was introduced into evidence at trial. Among these were that the plaintiff had incurred $198.01 in expenses for prescriptions, $310.00 in mileage expenses while seeking medical treatment, and $18,847.05 in doctor, hospital and other medical bills.
In brief, plaintiff's attorney seeks to recover additional prescription expenses over and above those in the stipulation. Counsel's brief also asserts bills for Drs. Burda, Pineda and Powell which are higher than the stipulated amounts. We are unable to find support in the record for either the additional prescription expenses or the higher doctor bills. The record indicates that only the stipulated sums remain outstanding. Plaintiff is therefore entitled to recover only the stipulated sums.
While the plaintiff is not entitled to an award for future medical expenses, the right to claim such expenses is always reserved to him. Lester v. Southern Casualty Insurance Co., 466 So.2d 25 (La.1985); Wilson v. Ebasco Services, Inc., 393 So.2d 1248 (La.1981); Allums v. Dixie Metals Co., 369 So.2d 1204 (La.App. 2d Cir.1979).

DECREE
For the reasons aforesaid, we will render judgment in favor of the plaintiff in the following manner.
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the plaintiff, CLARENCE WILLS, and against the defendants, SOLIDA CONSTRUCTION COMPANY and HARTFORD ACCIDENT AND INDEMNITY COMPANY, in solido, in the sum of FORTY-ONE THOUSAND, NINE HUNDRED TWELVE and No/100 ($41,912.00) DOLLARS (representing past due compensation payments for temporary total disability), together with legal interest thereon from the date each payment was due; and for the additional sum of NINETEEN THOUSAND, THREE HUNDRED AND FIFTY-FIVE and 06/100 ($19,355.06) DOLLARS (representing stipulated unpaid medical expenses), with legal interest thereon from the due date of each.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the plaintiff, CLARENCE WILLS, and against the defendants, SOLIDA CONSTRUCTION COMPANY and HARTFORD ACCIDENT AND INDEMNITY COMPANY, for the sum of TWO HUNDRED FORTY-EIGHT and No/100 ($248.00) DOLLARS a week from May 10, 1989 as worker's compensation as long as the disability continues.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the expert fee of Dr. Richard Flicker is fixed at FIVE HUNDRED and No/100 ($500.00) DOLLARS, and the same is ordered taxed as costs herein.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment recognizing a privilege in favor of the attorneys Patricia Miramon, James M. Johnson and C. Don McNeill for their legal fees on any amounts collected; said privileges being limited to twenty percent (20%) of the first $10,000 collected and ten *1374 percent (10%) thereafter in accordance with LSA-R.S. 23:1141 B. Mrs. Miramon's fee is established as eighty percent (80%) of the total fee, Mr. Johnson's as eight percent (8%), and Mr. McNeill's as twelve percent (12%).
All costs of this litigation are assessed against the defendants.
REVERSED AND RENDERED.
NOTES
[*] This statute authorizes an attorney to take an interest in the subject matter of a claim or expected litigation as his fee. The statute does not grant a privilege on the fee but specifies that by contract the parties may provide that neither the attorney nor the client may dispose of the suit or claim without the consent of the other.