544 So.2d 485 (1989)
JIM WALTER HOMES, Plaintiff/Defendant-in-Reconvention/Appellee,
v.
Connie LEWIS, Defendant/Plaintiff-in-Reconvention/Appellant.
No. 20423-CA.
Court of Appeal of Louisiana, Second Circuit.
May 10, 1989.
Application for Rehearing Denied and Application for Rehearing Granted in Part June 1, 1989.
Rehearing Granted August 23, 1989.
*486 Neblett, Beard & Arsenault by Gregory R. Aymond, Alexandria, for defendant/plaintiff-in-reconvention/appellent.
Sutherland, Juge & Keevers by Denis Paul Juge, Jeffrey C. Napolitano, New Orleans, for plaintiff/defendant-in-reconvention/appellee.
Before HALL, MARVIN, Fred W. JONES, Jr., SEXTON and NORRIS, JJ.
Plaintiff's Application for Rehearing Denied and Defendant's Application for Rehearing Granted in Part June 1, 1989.
*487 SEXTON, Judge.
The defendant/plaintiff-in-reconvention, Mr. Connie Lewis, appeals the judgment of the trial court awarding him worker's compensation only through August 16, 1988. The plaintiff/defendant-in-reconvention, Jim Walter Homes, Inc., answered the appeal. We amend and affirm as amended.
Mr. Lewis, a carpenter, was injured around May 22 or 23, 1985 while he was working as a subcontractor on a job for Jim Walter Homes. He injured his back when a wall which he was attempting to raise fell on him.
He saw Dr. John B. Luke, a family practice doctor, on May 24, 1985. Mr. Lewis complained of pain in his neck and the lumbosacral muscles. He also had decreased range of motion in the lumbar spine. On June 12, 1985, Dr. David M. Carlton, Dr. Luke's partner, examined Mr. Lewis. He was still having pain in his back, and Dr. Carlton prescribed Decadron, a form of cortisone. Dr. Carlton saw him again on July 8, 1985. He was continuing to have back pain which radiated down his leg. He told Dr. Carlton that the pain was getting worse. Dr. Carlton put him in St. Francis Cabrini Hospital in Alexandria, Louisiana. Lewis was hospitalized from July 8, 1985 to July 13, 1985. While Mr. Lewis was in the hospital, Dr. Carlton took x-rays of the lumbar spine, put Mr. Lewis in pelvic traction, and prescribed sedatives and cortisone.
At Dr. Carlton's request, Dr. John Patton, a neurosurgeon, examined Mr. Lewis on July 9, 1985. Dr. Patton noted some restriction of movement in the neck in all directions, but found no muscle spasm in the neck. Straight leg raising could be done to 90 degrees on the right side but only to 75 to 80 degrees on the left side. Straight leg raising caused pain in his back which radiated down his left leg to just below the knee. There was a mild degree of lumbar muscle spasm. Dr. Patton suspected that he had some cervical degenerative disease and a lumbar pinched nerve at either L5 or S1, possibly due to a ruptured disc or degenerative changes. He recommended that Mr. Lewis have cervical spine x-rays and a CT scan of the lumbar spine and that the conservative treatment be continued.
The CT scan was done on July 9, 1985. The CT scan was normal except for some mild degenerative changes involving the facet joints in the lumbar spine. Dr. Patton stated that this was not an unusual condition, particularly in someone who has done manual labor for a number of years. Cervical spine x-rays showed mild degenerative changes in his neck. There was no evidence of a herniated disc.
Dr. Patton saw him again on July 10, 11, and 12, 1985. On the last visit, Mr. Lewis told Dr. Patton that his leg and back were better. Dr. Patton prescribed rest and mild pain medicine.
Although Dr. Patton did not believe that Mr. Lewis had a herniated disc, he did believe that he had a pinched nerve at L5 or S1.
Mr. Lewis saw Dr. Carlton for the last time on August 7, 1985. Dr. Carlton noted that his back was better although it was still tight, that he had difficulty bending and straightening up, and that he was having muscle spasms in the lumbar spine. Dr. Carlton testified that he did not release Mr. Lewis from treatment at this time. On August 23, 1985 Dr. Luke saw Mr. Lewis for the last time. Mr. Lewis's back had gotten much better with home traction. He was using home traction three times a week. He still had discomfort in L5 and S1. Straight leg raising up to 90 degrees was without pain.
Dr. Carlton thought that Mr. Lewis did have a bulging disc. However, he recommended that Mr. Lewis go back to work and "give it a try and see what happens." He testified that some people can return to work with a bulging disc and have no problems. It was his opinion, however, that it was more probable than not that Mr. Lewis's symptoms would recur if he returned to bending and lifting.
On January 23, 1986 Mr. Lewis saw Dr. Patton again still complaining of pain in his back. Dr. Patton did a neurologic examination with reference to the spine. The exam *488 was normal, and Dr. Patton felt that Mr. Lewis had reached maximum medical improvement. While Dr. Patton believed that Mr. Lewis could return to work, he testified that Mr. Lewis would have to be trained how to lift properly and should lift no more than 25 pounds.
Dr. Jonathan Forester, a family practice doctor who had seen Mr. Lewis on two earlier occasions for problems unrelated to his back, examined Mr. Lewis's back for the first time on July 17, 1986. Mr. Lewis told him that the pain was not radiating into his left leg like it had been previously and that he was on home traction intermittently. He experienced pain when he raised his left leg. He had weak foot eversion and weak flexion of the leg which Dr. Forester testified generally implies an innervation of the muscle. There was mild sensory decrease in his left foot. It was Dr. Forester's conclusion that Mr. Lewis would have to be rehabilitated in order to do work other than construction work. He also thought that he should not lift items weighing more than ten pounds.
On August 5, 1986 Mr. Lewis saw Dr. Ken T. Johnson, Jr., Dr. Forester's associate. Upon examination, Dr. Johnson noted that the muscle pain seemed to be centered in the lower lumbar area. There were muscle spasms in the left region of the buttocks. Mr. Lewis had subjective numbness along the lateral side of his left leg. A deep tendon reflex check revealed decreased reflex on the left side. The straight leg test was positive at about 30 to 40 degrees on his left leg. Dr. Johnson diagnosed low back syndrome with a possible ruptured disc. Because he was worried about a ruptured disc, he hospitalized Mr. Lewis at Rapides General Hospital. Mr. Lewis was in the hospital from August 5 through August 8, 1986. He was put in pelvic traction, and anti-inflammatory medicine and muscle relaxants were continued. A second CT scan was done. It showed a slight central bulge of the disc at the L5-S1 level but no focal disc herniation or nerve root compression at any level. Dr. Johnson recommended that Mr. Lewis do no heavy lifting or repeated bending. As a general rule, he recommends that patients such as Mr. Lewis not lift more than 20 or 25 pounds. Dr. Johnson did not see Mr. Lewis after he was released from the hospital.
On October 20, 1986 Mr. Lewis saw Dr. Anthony S. Ioppolo, a neurosurgeon, at the request of Jim Walter Homes. Dr. Ioppolo concluded that Mr. Lewis's complaints of pain were exaggerated. He testified that he could find no objective evidence of any problems that would explain the severity of Mr. Lewis's complaints. He did state that the second CT scan showed a bulging disc but explained that a bulging disc is a relatively common finding. A bulging disc becomes important only if it is pressing on a nerve. He believed that Mr. Lewis could return to work as a carpenter. He did recommend that Mr. Lewis seek vocational rehabilitation to help him return to work.
On September 3, 1987 Mr. Lewis again saw Dr. Patton. Mr. Lewis still had pain in his back and left leg. Dr. Patton noted that sensory testing was slightly decreased in the left leg and foot. The results of the straight leg raising test were positive on the left leg. Dr. Patton reiterated his position that Mr. Lewis did need to be rehabilitated for work which did not require repetitive bending or heavy lifting of more than about 15 to 20 pounds.
Mr. Lewis is 45 years old and has a ninth grade education. He has been a carpenter all of his life. Before this accident he had had no back problems. He feels that he is now unable to do carpentry work. He has not worked since the accident. This is the first time in his life that he has been without work. He cannot bend over and pick up heavy loads, and he cannot perform simple tasks like carrying groceries.
Mr. Lewis began receiving compensation on May 23, 1985. On May 16, 1986, Jim Walter Homes filed a petition for declaratory judgment disputing the occurrence of a work-related accident and asserting in the alternative that it owed no further worker's compensation benefits to Mr. Lewis. Jim Walter Homes asked the court to determine the disability status of Mr. Lewis while it was continuing to pay benefits. *489 Jim Walter Homes stopped paying benefits on July 16, 1986. On January 2, 1987, Mr. Lewis filed a reconventional demand and amended his previous answer. He asserted that as a result of the work-related accident he had sustained a disc injury which has rendered him permanently and totally disabled. He claimed that he was entitled to sixty-six and two-thirds percent of his weekly wages as long as the disability persisted, together with all related medical expenses retroactive to the termination of the benefits, all costs of the proceedings, and penalties and attorney's fees.
At trial the parties stipulated that Mr. Lewis was employed by Jim Walter Homes on the date of the alleged accident and that worker's compensation benefits were paid at a rate of $248 a week from May 23, 1985 through July 16, 1986.
The trial court found that (1) Mr. Lewis was injured in a work-related accident, (2) he was unable to work for a time, and his pain and suffering had not sufficiently diminished to warrant discontinuation of worker's compensation benefits, and (3) he was entitled to a "reduced" benefit[1] of $100.65 per week from July 16, 1986 through August 16, 1988. In its written reasons for judgment, the trial court stated that it was giving Mr. Lewis an extra six months for rehabilitation and retraining for a position in which he can work. The judgment itself, however, makes no mention of rehabilitation or a rehabilitation period. It simply awards compensation in the fashion we have indicated.
Mr. Lewis appealed, arguing that the trial court erred in not finding him temporarily and totally disabled, in not awarding him penalties and attorney's fees, and in not awarding him reimbursement for certain medical expenses. He has abandoned his claim that he is permanently and totally disabled.
Jim Walter Homes answered the appeal. It argued that Mr. Lewis was not entitled to benefits after July 16, 1986 because his condition had stabilized at that time and he could return to some form of employment, that he is not entitled to rehabilitation services because he is presently capable of earning wages equal to or greater than his pre-accident earnings, and that it is entitled to reimbursement or credit for amounts that it had allegedly overpaid Mr. Lewis.

TEMPORARY TOTAL DISABILITY
LSA-R.S. 23:1221(1) provides as follows:
(1) Temporary total. For injury producing temporary total disability of an employee to engage in any self-employment or gainful occupation for wages whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, or experience, sixty-six and two-thirds percent of wages during the period of such disability.
Mr. Lewis argues that the medical evidence establishes that he is temporarily and totally disabled. He contends that no doctor who has treated him has unconditionally released him to return to work. He asserts that he has established that he fits in the category of the odd-lot worker.
In Green v. Jackson Rapid Delivery Service, Inc., 506 So.2d 1345 (La.App. 2d Cir.1987), this court set forth the law on the determination of temporary total disability. We quote liberally from that opinion:
In order to establish temporary total disability the claimant is only required to prove his disability by a preponderance of the evidence. He is entitled to an award for temporary total disability if he establishes he is disabled to do the same occupation or other gainful occupation at the time of trial, though it appears he will be able to return to some type work in the forseeable future. Brewster v. Manville Forest Products Corp., 469 So. 2d 340 (La.App. 2d Cir.1985); Price v. Fireman's Fund Insurance Co., 502 So. 2d 1078 (La.1987); LSA-R.S. 23:1221(1),
*490 (2). A claimant is entitled to temporary total disability if he fits in the "odd lot" category in that he can perform no services other than those which are so limited in quality, dependability or quantity that a reasonably stable market for them does not exist. This determination is made after scrutiny of the evidence of the claimant's physical and mental capacity, education and training. Thomas v. Elder Pallet & Lumber Sales, Inc., 493 So.2d 1267 (La.App. 3d Cir.1986). An employee who can only perform his work in pain is entitled to a temporary total disability award. Johnson v. Monroe Pulpwood Co., Inc., 505 So.2d 862 (La. App. 2d Cir.1987).
Green v. Jackson Rapid Delivery Service, Inc., supra at 1349 (footnote omitted).
In the instant case, the question of whether Mr. Lewis is entitled to temporary total disability benefits is a difficult one. The trial court specifically determined that the claimant's pain and suffering had not sufficiently diminished to warrant a discontinuation of compensation benefits. The law states that these benefits are payable only "during the period of [the] disability." LSA-R.S. 23:1221(1). However, the trial court awarded these benefits until August 16, 1988 stating that it was giving Mr. Lewis "this extra six month consideration for a retraining period within which he is to submit to rehabilitation/retraining for a position in which he can work."
In other words, the trial court rendered continued temporary total benefits until a specific point in the future, contrary to the intent of the statute. Bailey v. Zurich American Insurance Co., 503 So.2d 611 (La.App. 4th Cir.1987). However, it assessed this period for rehabilitation purposes. Perhaps the court was attempting to apply LSA-R.S. 23:1226(E) and (F) which allow a claimant to receive specific rehabilitation services to be paid by the employer. These benefits, however, are distinct from Section 1221 benefits. Indeed, the act contemplates that the claimant will receive temporary total disability benefits while he is being retrained at the employer's expense. Johnson, Bound in Shallows and Miseries: The 1983 Amendments to the Workers' Compensation Statute, 44 La.L. Rev. 669, 713 (1984).
Simply stated, the trial court award of total disability for a specific time for "rehabilitation" and its concurrent finding that the plaintiff's pain and suffering had not sufficiently diminished to warrant a discontinuation of compensation benefits is contradictory.
The medical evidence, which we have previously reviewed in some detail, does not present a clear picture. Dr. Patton, the orthopedic surgeon who saw the plaintiff primarily during his hospitalization by Dr. Carlton, thought that Mr. Lewis did not have a herniated disc but did have a pinched nerve. He felt that he could return to his occupation as a carpenter but would have to be trained to use his back in the correct manner and not to lift heavy objects.
Dr. Carlton's findings were approximately the same except that he expected Mr. Lewis's symptoms to return if he began to bend and lift to any extent on his job.
About four months after last seeing Dr. Carlton, plaintiff again saw Dr. Patton who felt that Mr. Lewis had reached maximum improvement. Other than the plaintiff's subjective complaints, the examination was normal. Dr. Patton thought that Mr. Lewis could return to carpentry if he learned to lift properly, to use his back properly and if he restricted the items he lifted to no more than 20 pounds.
About six months later, in the summer of 1986, Mr. Lewis began to see the general practitioners, Drs. Forester and Johnson, who found objective symptoms to include muscle spasm and decreased reflexes. They also found Mr. Lewis to be positive upon straight leg raising. Mr. Lewis was again hospitalized and another CT scan was done. It also showed a slight disc bulge in the low back but did not show herniation or nerve root compression. However, Dr. Forester specifically recommended that Mr. Lewis do no heavy lifting or repeated bending.
Dr. Ioppolo, a neurosurgeon Mr. Lewis saw at the request of Jim Walter Homes, determined that Mr. Lewis was exaggerating his complaints, although he did find a bulging disc. However, he noted this condition *491 is relatively common and thought that Mr. Lewis could return to work.
Almost a year later, in September of 1987, Mr. Lewis was again seen by Dr. Patton who found some objective signs as well as positive straight leg raising. His prognosis was basically unchanged from the plaintiff's previous visit.
Obviously, Mr. Lewis's condition is not so severe that he requires constant medical attention. However, from time to time he continues to exhibit objective symptomatology. On the other hand, he seems to have reached maximum medical improvement and there is no indication that further medical attention is warranted. It further appears from the sum total of the medical evidence that Mr. Lewis can return to work, although there may be some question of whether he can return to carpentry. However, the consensus seems to be that he can do so if he learns to lift properly.
In our view, under the foregoing circumstances, the claimant is not entitled to be considered temporarily totally disabled subsequent to September 3, 1987, the date of his last examination by Dr. Patton, the neurosurgeon the claimant consulted for approximately two years. Thus, temporary total disability benefits should terminate as of that date.

AMOUNT OF BENEFITS
There is, additionally, a dispute as to the level of benefits to which the plaintiff is entitled. The trial court found that Mr. Lewis was entitled to $100.65 per week from July 16, 1986 through August 16, 1988. The trial court apparently determined that Mr. Lewis was employed on a "unit, piecework, commission or other basis" as provided in LSA-R.S. 23:1021(10)(d).[2] The trial court performed the calculations called for in this section to obtain an average weekly wage of $150.98 and a compensation rate of $100.65 per week.[3]
Jim Walter Homes contends that the trial court was in error in not also subtracting the amount of worker's compensation insurance that Mr. Lewis paid for his employee.
We find that LSA-R.S. 23:1021(10)(d) does not apply to this case. Jim Walter Homes concedes in its brief that Mr. Lewis was employed on a contract basis. It seems clear that a substantial part of his work time was spent in manual labor in carrying out the terms of the contract. Thus, he is one of those independent contractors who is covered by the worker's compensation act by virtue of LSA-R.S. 23:1021(6).
If the injured party is an independent contractor engaged in manual labor of the same kind as that done by his employees, then his profits and overhead cannot be included as a part of "wages" in calculating his weekly rate of compensation benefits. In this situation, courts should determine the prevailing wage for work similar in character to that performed by the claimant and use that amount to compute the amount of compensation due. Carter v. Consolidated Underwriters, 62 So.2d *492 682 (La.App. 2d Cir.1953); Hamilton v. American Insurance Co., 439 So.2d 547 (La.App. 1st Cir.1983); Burgess v. Southern Casualty Insurance Co., 203 So.2d 434, 437 (La.App. 3rd Cir.1967); 14 W. Malone and A. Johnson, Louisiana Civil Law Treatise, § 327 at 105-06.
The record in this case does not reveal what a carpenter with Mr. Lewis's experience would have made at the time of the accident. Although there is some evidence to indicate the total amount Mr. Lewis paid his employees, it cannot be determined from the record what the prevailing wage is for someone of Mr. Lewis's experience. It will therefore be necessary that we remand this case to the trial court for a determination of Mr. Lewis's compensation rate from July 16, 1986 to September 3, 1987 and for a lump sum judgment based on that rate.

SEB BENEFITS
While Mr. Lewis is not entitled to temporary total benefits after September 3, 1987, he may be entitled to supplemental earnings benefits as provided in LSA-R.S. 23:1221(3). An injured employee is entitled to SEB benefits if the injury results in his inability to earn wages equal to 90 percent or more of his wages at the time of the injury. LSA-R.S. 23:1221(3)(a).
At the time of trial, Mr. Lewis was not working. As we noted, the medical testimony establishes that Mr. Lewis is able to work. There was no evidence to suggest that he had been offered any employment. According to LSA-R.S. 23:1221(3)(c)(i), if the employee is not engaged in any employment or self-employment, the amount determined to be the wages the employee is able to earn in any month shall not be less than the sum he would have earned in any employment or self-employment which he was physically able to perform and which is proven available to the employee in the employee's or the employer's community or reasonable geographic region.
Lionel Bordelon, the vocational rehabilitation expert who testified for Jim Walter Homes, did a labor market survey for sedentary work and light duty work for a carpenter. He found that the following jobs were available in the Alexandria/Pineville area where Mr. Lewis lives: cashier, convenience store clerk, and sporting goods salesman. He testified that Mr. Lewis could do these jobs with some on-the-job training. Mr. Bordelon also testified that these jobs were available at minimum wage or slightly above.
We find that the employer has carried its burden of establishing that there was work available to Mr. Lewis under his medical circumstances at the minimum wage. Mr. Lewis did not rebut the evidence presented by Jim Walter Homes.
The minimum wage is $3.35 an hour. 29 U.S.C.A. § 206 (1978). Thus, working 40 hours a week at that wage, the claimant would receive $134.00 a week. However, because we are unable to determine plaintiff's average weekly wage as defined by worker's compensation law (as we indicated in the previous section), we are unable to determine whether the plaintiff is entitled to SEB benefits. This question is also remanded to the trial court for determination thereon consistent with this opinion.

PENALTIES AND ATTORNEY'S FEES
Mr. Lewis argues that Jim Walter Homes was arbitrary and capricious in terminating his benefits and that as a result he is entitled to penalties and attorney's fees. LSA-R.S. 23:1201.2 provides that an employer or its insurer shall be liable for penalties and attorney's fees for terminating benefits when the action is arbitrary, capricious or without probable cause.
Whether a termination of benefits is arbitrary, capricious or without probable cause depends primarily on the facts known to the employer or insurer at the time of its action. Lee v. Smith, 248 La. 16, 176 So.2d 413 (1965); Lamette v. Morrison Assurance Co., 461 So.2d 351 (La.App. 2d Cir.1984). The termination of benefits is not arbitrary, capricious or without probable cause when it is based upon legitimate disputes as to the extent or cause of the claimant's disability. Lamette v. Morrison Assurance Co., supra; Harrison v. Chicago Mill & Lumber Co., 446 So.2d 843 (La. App. 2d Cir.1984). The question is one of fact and the trial court's finding should not be disturbed on appeal absent manifest error. Lamette v. Morrison Assurance Co., supra.
The trial court did not award penalties and attorney's fees. Jim Walter Homes asserts that it terminated the benefits based upon the statements of Dr. Patton and Dr. Carlton in their depositions which were taken on July 24 and 25, 1986. Jim Walter Homes points out that Dr. Patton stated that Mr. Lewis had reached maximum medical improvement, that there were no objective signs of disability and that Lewis sustained no permanent disability. Jim Walter Homes further asserted that Dr. Carlton stated that Mr. Lewis could return to work.
*493 At the time of the deposition, it had been over a year since Dr. Carlton had seen Mr. Lewis. Dr. Carlton stated in his deposition that on the last visit, he recommended that Mr. Lewis try to return to work.
We find that it was not arbitrary or capricious for Jim Walter Homes to rely on the statements of these doctors in making its decision to terminate benefits. Termination of compensation will not be held to have been arbitrary or capricious where the insurance carrier bases its decision to terminate on competent medical advice. Martin v. H.B. Zachry Co., 424 So.2d 1002 (La.1982); Alexander v. LaGrange, 509 So.2d 540 (La.App. 3rd Cir.1987). This is true even when subsequent litigation on the claim results in a decision adverse to the insurer. Olson v. Insurance Company of State of Pennsylvania, 471 So.2d 1151 (La.App. 3rd Cir.1985), writ denied, 476 So.2d 352 (La.1985).

REIMBURSEMENT CREDIT
Jim Walter Homes contends that it is entitled to reimbursement of, or a credit for, amounts that it has overpaid. It contends that it had paid Mr. Lewis the maximum compensation of $248 per week because Mr. Lewis asserted that he netted $1500 per month. According to Jim Walter Homes, this assertion was later shown to be false. At the time it made its decision to pay $248 a week, it did not have the records concerning Lewis's expenses or days actually worked.
In support of its argument, Jim Walter Homes cites Johnson v. State, through Division of Administration, 510 So.2d 87 (La.App. 1st Cir.1987). This case is distinguishable. In Johnson the plaintiff was found not to have sustained a compensable injury. It is well established that amounts paid in excess compensation cannot be credited as payment for future compensation. Herrin v. Georgia Casualty & Surety Co., 414 So.2d 1323 (La.App. 2d Cir.1982). Excess compensation payments made prior to judgment are considered to be in the nature of a "gratuity" and may not be credited as payments for future compensation. Harris v. Louisiana Paving Co., 427 So.2d 1352 (La.App. 2d Cir.1983). Jim Walter Homes' claim in this respect is therefore rejected.

MEDICAL EXPENSES
Mr. Lewis argues that the trial court erred in failing to award certain medical expenses. Jim Walter Homes contends that it is not liable for these expenses because these expenses were incurred for treatment that was unreasonable and unnecessary.
LSA-R.S. 23:1203(A) provides that the employer has the obligation to furnish all necessary medical care. The employee in a worker's compensation action is obliged to prove with specific evidence the actual medical services rendered as a consequence of the injury. Sewell v. Argonaut Southwest Insurance Co., 362 So.2d 758 (La.1978).
In his brief Mr. Lewis argues that he is entitled to recover the following medical expenses which were incurred as a result of his back condition:

Rapides General Hospital $ 631.00
Dr. I. Chaudhry 24.00
Dr. Ken Johnson 380.00
Rapides Radiology 155.00
Dr. John Luke 132.00
St. Francis Cabrini Hospital 26.00
Drs. Alexander and Buckley 43.00
Drs. Maxwell and Roberts 9.00
Alexandria Physical Therapy 328.50
Dr. Jonathan Forester 319.00
Dr. Patton 180.00
Dr. Johnson 330.00
 _________
TOTAL.........................$2,557.50

The record establishes that Jim Walter Homes has paid the following expenses:

Dr. John Luke $114.00
Drs. Alexander & Buckley 43.00
Drs. Maxwell & Roberts 9.00
Alexandria Physical Therapy 146.00
Alexandria Physical Therapy 182.50
Dr. John Luke 18.00
 _______
TOTAL...........................$512.50

The expenses which Jim Walter Homes has not paid are principally related to the treatment of Mr. Lewis by Drs. Johnson and Forester, and his hospitalization by them. Jim Walter Homes disputes that this treatment was necessary. We disagree. Both of these doctors found objective signs of a back problem and related the problem that they treated to the instant accident.
However, we should note that with respect to Dr. Johnson's fee, there are two separate claims. One is for $380 and one is $330. It appears that these claims are a duplication, with the higher claim including a $50 charge for preparation of records and a narrative. The plaintiff, therefore, is only entitled to recovery of $330 for Dr. *494 Johnson's fee. Also, as to the $319 charge from Dr. Forester, the evidence only supports charges of $234.
In addition, the $26 bill from St. Francis Cabrini was for preparation of hospital records and is not recoverable. Thus, $491 of the amount claimed by Mr. Lewis is inappropriate, and Jim Walter Homes has paid $512.50 of the sum claimed. There should therefore be judgment in favor of the plaintiff in the amount of $1,554, representing unpaid medical expenses.

DECREE
In summary in this cause, we have determined that Mr. Lewis was temporarily totally disabled until September 3, 1987, but that his rate of compensation was erroneously determined. We are remanding the case for a determination of the correct rate of compensation and a determination of whether, based on that rate, the claimant is entitled to SEB benefits. We have determined he is entitled to unpaid medical expenses in the amount of $1,554. We have rejected Mr. Lewis's claim for penalties and attorney's fees and Jim Walter Homes' claim for reimbursement. The judgment appealed will be amended to add the following paragraph:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of CONNIE LEWIS and against JIM WALTER HOMES in the amount of $1,554, representing unpaid medical expenses, and for legal interest thereon until paid.
The case is remanded to the trial court for determination of the appropriate level of compensation and for a lump sum award thereon from the week of July 16, 1986 through the week of September 3, 1987, and for a determination of whether, based on the rate of compensation, the plaintiff is entitled to supplemental earnings benefits.
The judgment appealed is therefore amended as aforesaid and remanded for further proceedings consistent herewith at the cost of Jim Walter Homes, Inc.
AMENDED AND REMANDED.
FRED W. JONES, Jr., Judge, concurring in part and dissenting in part:
I agree with the majority that this case should be remanded to the trial court for the presentation of evidence on the question of what a carpenter with claimant's experience in the area involved would have made on an hourly basis at the time of the accident, and for determination by the trial judge of the worker's compensation benefits to which Lewis is entitled. However, I dissent from the conclusion of the majority that Lewis' disability ceased as of September 3, 1987.
At the trial, which was held on September 10, 1987, the claimant Lewis testified that he was injured when the weight of a 52 foot-long wall fell on him. The claimant consulted his family physician about the injury a couple of days later. His subsequent medical history is detailed in the majority opinion.
Lewis said that, at the time of the trial, his back continued to give him problems. He was frequently unable to bend over and tie his shoes. He could not help his wife bring in groceries from the store. He could not sit for long in one position, but would have to get up and walk around.
The claimant's wife of 26 years corroborated this testimony. She stated that her husband often complained of pain in his back; took Tylenol frequently; had fallen a couple of times when his left leg "gave out"; some mornings could hardly get out of bed; had to have her assistance in getting dressed.
The medical testimony supports claimant's assertion of disability. Dr. Carlton, even though recommending that Lewis return to work and "see what happens", thought the odds were that, with a bulging disc, Lewis would suffer a ruptured disc. Dr. Carlton added that, if Lewis still complained of back pain, he should not return to heavy labor.
Dr. Patton testified that Lewis would not be able to return to the work force unless retrained. He said that Lewis could not do repetitive bending, climbing, twisting, or lifting more than 10 or 20 pounds. If so, "he would just wind up with more back pain."
Dr. Johnson's recommendation was "rest, no heavy lifting or repeated bending or prolonged heavy lifting or anything like that."
As the majority opinion notes, even the trial judge found that Lewis was disabled at the time of the trial, but only awarded him benefits until August 16, 1988contrary to the law.
I don't think the trial judge was clearly wrong in his fact-finding that Lewis was temporarily totally disabled. The record shows that he was "disabled to do the same occupation (carpentry) or other gainful occupation at the time of trial." Therefore, I respectively dissent from the conclusion of the majority that Lewis was not temporarily totally disabled subsequent to September 3, 1987.

*495 ON APPLICATION FOR REHEARING
Before MARVIN, FRED W. JONES, SEXTON, HALL and NORRIS, JJ.
Rehearing denied.

ON REHEARING
PER CURIAM.
We granted a rehearing herein limited to a consideration of the contention of Jim Walter Homes that it is entitled to a credit for overpayment of compensation benefits. We rejected this contention in our original opinion based on Herrin v. Georgia Casualty & Surety Co., 414 So.2d 1323 (La.App. 2d Cir.1982). Herrin in turn relied on Allor v. Belden Corporation, 382 So.2d 206 (La.App. 3rd Cir.1980), reversed on other grounds, 393 So.2d 1233 (La.1981). Allor's primary authority was Futrell v. Hartford Accident & Indemnity Co., 276 So.2d 271 (La.1973), which used 2 A. Larson, Workmen's Compensation, § 57.47 to interpret LSA-R.S. 23:1206, which then read:
Any voluntary payments made by the employer or his insurer either in money or otherwise, to the injured employee or his dependents, and accepted by the employee, which, by the terms of this act, were not due and payable when made, may, subject to the approval of the court, be deducted from the payments to be made as compensation; provided, that in case of disability, such deduction shall be made by shortening the period during which compensation shall be paid, and not by reducing the amount of the periodical payments.
On rehearing, Jim Walter Homes points out that Section 1206 was amended in 1983 to now read as follows:
Any voluntary payment or unearned wages paid by the employer or insurer either in money or otherwise, to the employee or dependent, and accepted by the employee, which were not due and payable when made, may be deducted from the payments to be made as compensation.
We agree with the contention made on rehearing that the amended section entitles an employer to a credit for previous overpayments from future compensation which may be due. Breaux v. Petro Drive, Inc., 534 So.2d 48 (La.App. 3d Cir.1988).
We therefore vacate that portion of our original opinion dealing with reimbursement credit which rejected Jim Walter Homes' claim therefor and now hold that Jim Walter Homes is entitled to a credit for any previous overpayments on any future compensation which may be due to Connie Lewis.
However, whether Jim Walter Homes will be able to claim that credit remains to be seen. As we noted in the original opinion, we were unable to determine on this record what Connie Lewis's rate of compensation should have been. Thus, we cannot at this time determine whether there were in fact overpayments, and if so, the extent thereof. Also, as we noted in the original opinion, the record is insufficient for us to determine whether Connie Lewis was entitled to supplemental earnings benefits. Thus, if there were overpayments and if Connie Lewis is entitled to supplemental earnings benefits, then Jim Walter Homes is entitled to a credit against any supplemental earnings benefits to be paid.
It will therefore be necessary to also remand this cause to the trial court for a determination of the extent of overpayments, if any, based on the correct rate of compensation. If the trial court determines that there have been overpayments and that the claimant is entitled to supplemental earnings benefits, then the trial court is ordered to authorize a credit for those overpayments to Jim Walter Homes in accordance with LSA-R.S. 23:1206.
In all other respects, the application for rehearing is denied, and the original opinion is maintained.
REHEARING GRANTED IN PART AND DENIED IN PART, AND REMANDED.
NOTES
[1] We are uncertain why the court used the term "reduced benefit" because the amount awarded appears to be the appropriate amount of compensation to which the plaintiff is entitled for temporary total disability.
[2] LSA-R.S. 23:1021(10)(d) provides that the average weekly wage is calculated as follows:

If the employee is employed on a unit, piecework, commission, or other basis, his gross earnings from the employer for the twenty-six week period immediately preceding the accident divided by the number of days the employee actually worked for the employer during said twenty-six week period and multiplied by four; however, if such an employee has worked for the employer for less than a twenty-six week period immediately preceding the accident, his gross earnings from the employer for the period immediately preceding the accident divided by the number of days the employee actually worked for the employer during said period and multiplied by four.
[3] The trial court arrived at this figure in the following manner. According to the IRS 1099 miscellaneous income form submitted to the IRS by Mr. Lewis, as well as the tax return of Lewis for 1985, Lewis was paid a total of $4,827.60 to complete the two jobs assigned to him in 1985. Mr. Lewis's 1985 tax return shows that his cost of labor for that year was $3,251.61. Subtracting this figure from the first figure, the trial court obtained the figure of $1,575.99. Out of this amount Mr. Lewis paid several expenses: $395.44 for car and truck expenses, $13.20 for utilities and telephone expenses, and $35 for bank serivce charges. These expenses came to a total of $443.64. The trial court subtracted this amount from $1,575.99 to get $1,132.35, Lewis's net proceeds. $1,132.35 divided by 30 days equals $37.745 per day; $37.745 times 4 equals $150.98 per week.