651 So.2d 335 (1995)
Bennie GREEN, Plaintiff-Appellee,
v.
CONAGRA BROILER COMPANY, Defendant-Appellant.
No. 26599-CA.
Court of Appeal of Louisiana, Second Circuit.
March 1, 1995.
*337 Watson, Murchison, Crews, Arthur & Corkern by Steven D. Crews, Natchitoches, for appellant.
Jim W. Wiley, Winnfield, for appellee.
Before NORRIS, HIGHTOWER and STEWART, JJ.
NORRIS, Judge.
The employer, Con Agra Broiler Company, appeals a workers compensation hearing officer judgment that awarded the claimant, Bennie Green, temporary total disability benefits from the date these were terminated, 26 weeks of vocational rehabilitation training, additional medical expenses and mileage, penalties plus interest, and attorney fees of $5,000.00. Finding that the hearing officer committed legal error in fashioning the award, we reverse and render.

*338 Factual background

Bennie Green was a 28-year-old unskilled laborer with limited education. He had been employed for about five years at Con Agra's Natchitoches chicken processing plant and, at the time of his injury in July 1990, was working in the "IQF Packout" area, making $5.96 per hour. On July 2 he stooped to lift a box and when he started up, a coworker ran into him with a pallet jack. This knocked Green to his knees, injuring his right knee. The following day he saw a local general practitioner, Dr. Knecht, on the company nurse's recommendation. Dr. Knecht gave him some pills and noted no special injury. (Dr. Knecht did report, however, that Green had injured his knee about two weeks earlier in an automobile accident which, by Green's description at trial, was fairly serious.) After he worked a few days and began complaining of pain and swelling in his knee, Green went to another doctor at Con Agra's recommendation, Dr. Sandifer. Dr. Sandifer saw him three times in August 1990, during which time Green was still working, but felt that Green was not progressing satisfactorily and referred him to an orthopedist in Shreveport, Dr. Webb.
Dr. Webb treated Green extensively for about a year. In September 1990 he performed arthroscopic surgery, finding and repairing a tear in the lateral meniscus, a "C"-shaped piece of cartilage around the front of the knee joint. He arranged for Green to take physical therapy and anticipated a few weeks off work. During this time Con Agra paid Green's weekly benefits and medical expenses.
Over the next few months Dr. Webb found every objective sign of improvement but Green kept complaining about pain and swelling. During this period, however, Dr. Webb never actually saw any swelling. One of Green's physical therapists, Mr. Guidroz, testified by deposition that Green attended therapy only sporadically and lacked motivation. Both Dr. Webb and Green's other therapist, Mr. Johnson, reported that Green was feigning a limp when he entered their offices, but appeared to walk just fine out on the parking lot. Dr. Webb also testified that Green resisted every suggestion that he try to return to work. By December 1990 Dr. Webb informed Con Agra that he had released Green; weekly benefits were eventually terminated in January 1991, and Green returned to work.
Despite his release by Dr. Webb, Green continued to complain of pain and swelling. In late December 1990 Dr. Webb ran an MRI of the knee; this was normal, but it showed small irregularities that he ascribed to the surgery. Dr. Webb testified there were no objective symptoms at all. In early January 1991 Green again reported to Dr. Webb, chiefly for treatment of a neck injury sustained in a minor auto accident, but also to complain that his knee was giving him problems when he stacked boxes.
On March 15, 1991 Green checked into the LSU Medical Center emergency room for knee pain; the hospital report states that he "reinjured" his knee, having "injured it in Feb." However, when he returned to Dr. Webb in April with obvious swelling and pain, he did not report any reinjury; yet Dr. Webb observed that "something must have happened," "some twisting problem to tear it again." Because of these objective symptoms and Green's persistent complaints, Dr. Webb scheduled another arthroscopy for April 17. Con Agra returned Green to weekly benefits at this time and paid for the surgery.
In the second operation Dr. Webb found a "repeat" tear of the lateral meniscus, which he repaired. During the follow-up he found swelling in Green's knee, and gave him medicine for inflammation. Green, however, continued to complain, saying he knew the knee was going to "give out" on him. Dr. Webb nevertheless felt that Green's chief problem was motivation; he was simply not willing to go to work. In August 1991 Dr. Webb sought a second opinion from another orthopedist, Dr. Springmeyer.
Dr. Springmeyer examined Green once, in August 1991, and other than sensitivity over the front of the knee, he found everything "basically normal." He recommended that Green return to some form of work that would alternate between standing and sitting. In mid-September, Green returned to Dr. *339 Sandifer, who drained some fluid off Green's knee, wrote that he could not return to his prior employment at the time, and referred him back to Dr. Webb. In late September Dr. Webb reviewed Dr. Springmeyer's report and concluded that Green had reached maximum medical improvement. He assigned a 10% permanent partial impairment and recommended that Green return to some form of sedentary work as of September 20, 1991. This was the last time Dr. Webb saw Green.
With this information, Con Agra's personnel representative, David Wedgeworth, and its rehab consultant, Sedgwick James of Georgia, decided that Green could work in less strenuous jobs at Con Agra. They sent Dr. Webb detailed descriptions of two jobs, "PM cutter" and evisceration re-hang ("Evis"), which not only paid more than the IQF Packer job but permitted the worker to sit on a stool.[1] Dr. Webb approved both. Con Agra instructed Green to return to work on November 11 and terminated weekly benefits and medical expenses effective that date.
Green returned to the plant on November 13; the accounts of what happened that day are divergent. Green admitted that he never actually set foot in Evis; however, he testified that the "fresh chicken" and "blood and guts" there would make him want to vomit. (In an earlier deposition he stated he refused to work because he had no work release; in point of fact, Dr. Webb had released him.) When he reported that he could not work in Evis, Mr. Wedgeworth called him "boy"; Green politely left, went outside and threw up; he then returned to Wedgeworth's office and told him, "I'm not your boy," and a heated shouting match ensued. Wedgeworth's version was that Green was resistant and belligerent when he arrived at the plant that morning. Green complained about the smell in Evis, but according to Wedgeworth there was no "blood and guts" and the smell was not offensive; moreover, he had seen Green go there many times to visit his girlfriend. He also testified that Green was retching before setting foot in Evis, then came to Wedgeworth's office making sounds as if to throw up. Wedgeworth told him not to do it there. According to Wedgeworth, Green threatened, "You're still going to get yours," then ran out of the office to the parking lot. Green has not been back to Con Agra since that date; he was terminated on November 26 for persistent failure to report to work.
At the hearing in September 1993, Green testified that his knee still hurts and swells if he exerts it. He admitted, however, that he had played basketball several times since November 1991. He also testified that he would like another surgery if it would relieve his symptoms, and job retraining. Since the termination of benefits, Green has checked into the emergency room at Huey P. Long Hospital in Pineville a few times. The first report, from November 25, 1991, shows that the knee x-ray was normal, and notes "Rt. kneeno pain, no swelling, movement of Rt. knee OK." Subsequent visits to the Huey P. Long outpatient clinic in 1993 (after the instant claim was filed) show that he still complained of pain and attended two therapy sessions. None of the doctors or therapists at Huey P. Long testified or were deposed for the instant hearing.

Applicable law
Compensation benefits are available for claimants who establish "personal injury by accident arising out of and in the course of" employment. La.R.S. 23:1031 A; Bruno v. Harbert Int'l Inc., 593 So.2d 357 (La.1992). The claimant's burden of proof in establishing a causal relation between a job-related accident and the disability is a preponderance of the evidence. Walton v. Normandy Village Homes Ass'n Inc., 475 So.2d 320 (La.1985); Lubom v. L.J. Earnest Inc., 579 So.2d 1174 (La.App. 2d Cir.1991).
Benefits for temporary, total disability are regulated by La.R.S. 23:1221(1), which provides in pertinent part:

*340 (1) Temporary total.
(a) For any injury producing temporary total disability of an employee to engage in any self-employment or occupation for wages, whether or not the same or a similar occupation as that in which the employee at the time of the injury was particularly fitted by reason of education, training, or experience, sixty-six and two-thirds percent of wages during the period of such disability.
* * * * * *
(c) For purposes of Subparagraph (1)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment * * *, compensation for temporary total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature of the employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
(d) An award of benefits based on temporary total disability shall cease when the physical condition of the employee has resolved itself to the point that a reasonably reliable determination of the extent of disability of the employee may be made, and the employee's physical condition has improved to the point that continued, regular treatment by a physician is not required, or six months after the injury, whichever first occurs. * * *
(emphasis added)
The provisions of § 1221(1)(c) requiring proof by clear and convincing evidence and excluding benefits for claimants who would work in pain were enacted in 1989, and apply to compensable injuries occurring after January 1, 1990. La.Acts 1989, No. 454, §§ 6, 13; Tanner v. International Maintenance Corp., 602 So.2d 1133 (La.App. 1st Cir.1992). In cases in which only a preponderance of evidence is required, the claimant's own testimony may be sufficient to discharge the burden of proof. Bruno v. Harbert Int'l Inc., supra.
Rehabilitation for injured employees is regulated by La.R.S. 23:1226, which provides in pertinent part:
A. When an employee has suffered an injury covered by this Chapter which precludes the employee from earnings wages equal to wages earned prior to the injury, the employee shall be entitled to prompt rehabilitation services.
B. (1) The goal of rehabilitation services is to return a disabled worker to work, with a minimum of retraining, as soon as possible after an injury occurs. The first appropriate option among the following must be chosen:

(a) Return to the same position.
(b) Return to a modified position.
(c) Return to a related occupation suited to the claimant's education and marketable skills.
(d) On-the-job training.
(e) Short-term retraining program (less than twenty-six weeks).
(f) Long-term retraining program (more than twenty-six weeks but not more than one year).
(g) Self-employment.
(emphasis added)
The provisions of § 1226 B which specify a minimum of retraining and seek, as a primary goal, the employee's return to his old position or a modified position, were added by legislation in 1989, effective January 1, 1990. La.Acts 1989, No. 454, § 6. Prior to the amendment, § 1226's purpose was to "educate and increase the job marketability of employees who cannot return to their former positions." Works v. Trinity Universal Ins. Co., 501 So.2d 1045 (La.App. 2d Cir.), writ denied 503 So.2d 480 (1987); Frazier v. Con-Agra Inc., 552 So.2d 536 (La.App. 2d Cir. 1989), writ denied 559 So.2d 124 (1990).
The workers compensation statute also contains penal provisions at issue in this case. At the time of Green's injury, § 1208 provided that if, for the purpose of obtaining or defeating any benefit or payment, any *341 person "wilfully makes a false statement or representation," he is subject to fine, imprisonment or both; and "[a]ny employee violating this Section shall in addition forfeit any right to compensation benefits under this Chapter." La.Acts 1989, No. 454, § 5.[2] Section 1201 E imposes penalties of 12% upon any employer or insurer who fails to pay comp benefits unless the employee's right to benefits has been "reasonably controverted by the employer or his insurer." Section 1201.2 further imposes "all reasonable attorney fees" on any employer or insurer who fails to pay within 60 days of receipt of written notice, "when such failure is found to be arbitrary, capricious, or without probable cause." Whether the termination of benefits is arbitrary, capricious or without probable cause depends primarily on the facts known to the employer or insurer at the time of its action. Lee v. Smith, 248 La. 16, 176 So.2d 413 (1965); Jim Walter Homes v. Lewis, 544 So.2d 485 (La.App. 2d Cir.1989) (on rehearing). When the decision is based on competent medical evidence, the termination of benefits will not be found arbitrary, capricious or without probable cause. Martin v. H.B. Zachry Co., 424 So.2d 1002 (La.1982); Jim Walter Homes v. Lewis, supra.
The hearing officer's factual findings are subject to the manifest error rule. Alexander v. Pellerin Marble & Granite, 93-1698 (La. 1/14/94), 630 So.2d 706. Under this rule, the reviewing court does not decide whether the factual findings are right or wrong, but whether they are reasonable. Stobart v. State, through Dept. of Transp. & Dev., 617 So.2d 880 (La.1993). Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d 840 (La.1989).

Discussion: Intervening accident and false representations
Two of Con Agra's arguments are resolved by the manifest error rule and do not merit lengthy discussion. By its first assignment of error Con Agra urges the hearing officer erred in finding that Green had shown, by clear and convincing evidence, a disability resulting from an on-the-job accident. The operative facts are that Green was admittedly injured on the job in July 1990, was treated and then released by Dr. Webb in December of that year, with apparently no symptoms; however, in February 1991 he told emergency room personnel that he had "reinjured" his knee, and Dr. Webb, upon examination in March 1991, suggested that Green must have sustained additional trauma for the symptoms to recur. No reinjury occurred on Con Agra's premises. Green both told Dr. Webb in March 1991 and testified at the hearing that there was no reinjury, but his symptoms were a continuation of the old injury. From these facts Con Agra urges that Green's current complaints must have arisen from some unspecified, off-the-job injury that occurred between December 1990 and February 1991, and that it is not compensable.
The claimant's burden in proving causation between a work-related accident and his disability is a preponderance of the evidence. Walton v. Normandy Village, supra; Lubom v. L.J. Earnest, supra. We find that Green's denial of an intervening accident at the hearing and in his history to Dr. Webb, and the fact that the pain and swelling were identical to that suffered during the first phase of treatment, provide an adequate factual basis for finding that Green's current problems do indeed relate back to the July 1990 accident. The hearing officer's finding is not unreasonable on the record presented and is not plainly wrong. Stobart v. State, supra.
By its third assignment Con Agra urges the hearing officer erred in not disqualifying Green from benefits because of "material misrepresentations." In support, Con Agra cites instances in which Green submitted excessive mileage vouchers for trips he made for therapy sessions; a deposition statement in which he denied injuring his knee in an auto accident a few weeks before he was hit with the pallet jack; various statements in which he denied that any *342 doctor had ever released him to return to work; and Dr. Webb's observation that Green's limp seemed to resolve after he left the doctor's office. Br., 12-13. The hearing officer, in reasons for judgment, did not even address the issue of forfeiture, effectively denying it.
At the hearing, Green testified that someone else had filled in his mileage vouchers, and he only signed them; elsewhere, the record is abundantly clear that Green has lower than normal intelligence and was obviously confused or flustered when testifying or giving statements to medical personnel. On this record, the hearing officer did not abuse her discretion by failing to find that Green made these statements "wilfully." Stobart v. State, supra. These assignments lack merit.

Temporary, total disability benefits
By its second assignment Con Agra argues the hearing officer erred in awarding benefits for temporary, total disability when Green's own testimony was the only basis for the award and that testimony was contradicted and impeached by other record evidence. Con Agra apparently does not contest Dr. Webb's assessment of a 10% impairment, but urges that it does not make Green physically unable to work in Evis re-hang or as a PM cutter, jobs which were available to Green at the plant.
Prior to the 1989 amendment of R.S. 23:1221(1), the claimant's burden of proof in claims for temporary, total compensation was a preponderance. See Prim v. City of Shreveport, 297 So.2d 421 (La.1974). Under this standard, the claimant's testimony alone could be sufficient to discharge the burden and prove disability. Bruno v. Harbert Int'l Inc., 593 So.2d at 361. However, the 1989 amendment significantly elevated the claimant's burden in many aspects of the compensation act. See, generally, A. Johnson, Workers' Compensation, 50 La.L.Rev. 391 (1989); La.Acts 1989, No. 454, § 6. Pertinent to this case, the amendment added the requirement that the claimant prove by "clear and convincing evidence" that he is physically unable to engage in any employment or self-employment.
Proof by clear and convincing evidence requires more than a "preponderance of the evidence," the traditional measure of persuasion in civil cases, but less than "beyond a reasonable doubt," the stringent criminal standard. Hines v. Williams, 567 So.2d 1139 (La.App. 2d Cir.), writ denied 571 So.2d 653 (1990), and citations therein. To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. Louisiana State Bar Ass'n v. Edwins, 329 So.2d 437 (La.1976). Justice Joseph Sanders of the Louisiana Supreme Court elaborated on the standard in a law review article:
The law requires that certain facts in civil cases be established by clear and convincing evidence. * * * Like the preponderance standard, the "clear and convincing evidence" standard seems to focus upon the objective quality of the evidence, rather than upon the degree of belief. Quite clearly, the standard requires a higher degree of proof than a preponderance of the evidence. * * * [T]he standard can be more easily understood if converted into terms of probability. The standard requires that the existence of the disputed fact be highly probable, that is, much more probable than its non-existence.
Sanders, "The Anatomy of Proof in Civil Actions," 28 La.L.Rev. 297, 304 (1968).
In the context of proving permanent disability in workers compensation cases, another authority has stated:
Since mere preponderance of the evidence would be insufficient, the employee's self-serving testimony, standing alone, would be insufficient. The employee would be required to present expert testimony and real evidence which conclusively proved the statutory requirements.
Niles, Juge and Cossé, The LABI Workers' Compensation Desk Book, II-9.
The critical evidence, in our view, includes the following: Dr. Webb, the treating physician, approved two jobs on November 1, 1991, as within Green's degree of impairment, and later testified by deposition that *343 Green could do this sedentary work; Dr. Springmeyer testified he saw no problem with returning Green to work that would alternate between standing and sitting; both doctors found Green had reached maximum medical improvement but had motivational problems; Dr. Sandifer's last office notes (September 13, 1991) state that Green cannot return to his prior employment, and that the patient was to return to Dr. Webb for evaluation. In sum, the medical evidence is unanimous that despite his residual impairment, Green is able to perform the kind of work offered by Con Agra. Further, the testimony of Green and Wedgeworth, despite the conflicts, clearly shows that Green's refusal to work in Evis was for one of the variety of excuses he offered, but not because of any impairment to his knee.
The contrary evidence consisted only of Green's persistent subjective complaints of swelling and pain in the knee; however, there is no evidence that either would disable him from the sedentary work offered. As noted, Green gave conflicting reasons why he would not do the work. The hearing officer apparently relied on Green's occasional trips to the emergency room at Huey P. Long Hospital in Pineville. The records of these visits, however, are simply inconclusive; the first one finds nothing at all wrong with Green's knee, and the subsequent ones show only that he complained of symptoms. There is no expert testimony, not even doctor's reports, to show that these subjective symptoms would disable him from the sedentary work offered. Green also offered no lay witnesses to corroborate his complaints of pain and inability to perform sedentary work. By contrast, Con Agra's lay witnesses saw Green playing basketball and walking effortlessly in the parking lot.
In short, the only evidence to support the hearing officer's finding of temporary, total disability is the claimant's own testimony, which had credibility problems, and some hospital records which were inconclusive. The medical evidence persuasively shows that Green should be able to do the sedentary work offered. Under the circumstances, we are constrained to find that the claimant's evidence does not meet the objective standard of clear and convincing evidence required by R.S. 23:1221(1)(c). The hearing officer was legally wrong to conclude otherwise. The judgment awarding these benefits will be reversed.

Rehabilitation services
By its fourth assignment Con Agra urges the hearing officer erred in awarding rehabilitation services when the evidence showed that there were other jobs available within Green's restrictions. Specifically, Con Agra argues the hearing officer misstated the law when she wrote in reasons for judgment, "The objective of rehabilitation is to educate and increase the job market abilities of employees who could not return to their former positions." Green counters that the hearing officer correctly applied the law as interpreted in Works v. Trinity Universal Ins. Co., supra, and argues that Con Agra's position here is no different from the one found to violate R.S. 23:1226 in Frazier v. Conagra, supra.
In Works v. Trinity Universal Ins. Co., supra, this court analyzed the situation of a construction worker who sustained a job-related injury that left him with a 25% permanent partial disability. The employer fashioned a new job for Works, that of "supervisor" to direct and oversee other employees who would perform the actual physical requirements of the job; this persuaded the fact finder that rehabilitation services were not necessary under R.S. 23:1226.[3] This *344 court noted that the employer's approach, and the trial court's analysis, was "simple and pragmatic," but not correct. 501 So.2d at 1047. We stated that the objective of rehabilitation was "to educate and increase the job marketability of employees who cannot return to their former positions." Id. We concluded that specialized job placement, such as Works's employer offered, was of an inherently temporary nature and did not satisfy the statute; rehabilitation services had to include "vocational education and appropriate training to make the worker competitive in the labor market." 501 So.2d at 1048. We reiterated this holding in Frazier v. Conagra, supra.
Since that time, however, the legislature has amended R.S. 23:1226. La.Acts 1989, No. 454, § 6. The new statute no longer extensively relies on vocational education and instead seeks a "minimum of retraining." It also provides that if the claimant is able to return to his old position, to a modified position, or a related occupation suited to his education and marketable skills, vocational training is not authorized. R.S. 23:1226 B(1)(a)-(c). Professor Johnson has stated that this amendment was "primarily aimed at overruling" Works. Johnson, Workers' Compensation, 50 La.L.Rev. at 401 (1989). Under the circumstances, we are constrained to find the hearing officer applied the wrong standard to this case.
The uncontradicted medical evidence shows that despite his residual impairment, Green is physically able to work in Evis re-hang or as a PM cutter at Con Agra's plant. Both of these jobs now pay more than his prior work in IQF Packout. Thus Green has not shown that he meets the requirement of § 1226 A. Moreover, it is obvious that the available, sedentary jobs will return him to a related occupation suited to his education and marketable skills with a minimum of retraining. For this reason, vocational retraining is simply not authorized.
In brief Green urges that Dr. Sandifer in effect recommended vocational training. Dr. Sandifer's opinion would not supersede the statute, if the other requirements were met. We observe parenthetically that the doctor's report states only that Green cannot return to his prior employment; it says nothing about the positions later approved by Dr. Webb. Further, Dr. Sandifer's prescription note of November 14, 1990 (shortly after the first surgery) does indeed mention "rehab," but taken in context this appears to be actually a request for physical therapy,[4] which Green attended only sporadically.
The hearing officer committed legal error by awarding Green vocational rehabilitation services; on the record presented, these are simply not authorized by the statute. This portion of the judgment will be reversed.

Penalties and attorney fees
By its sixth and seventh assignments, Con Agra urges the hearing officer erred in assessing penalties and attorney fees. First it argues that contrary to the hearing officer's finding, Con Agra never refused any request for payment of medical expenses. Second it argues that on the information available in November 1991, the decision to terminate comp benefits was not arbitrary, capricious or without probable cause. Green argues in brief that the hearing officer did not commit manifest error.
We have closely reviewed Green's testimony and the exhibits filed at the hearing. We are aware of four letters from Green's attorney to Con Agra (December 12, 1990, April 4, 1991, April 10, 1991, and November 11, 1991). None of these contains any request for medical expenses. We are also aware of Green's comment that he would like to undergo a third surgery, if it would relieve his problems. R.p. 250. He did not say that he requested this, and Dr. Webb did not recommend it. Dep., 25. On this evidence, we are constrained to hold that the *345 hearing officer was plainly wrong in finding that Con Agra refused to pay requested medical expenses.
Con Agra terminated Green's benefits effective November 11, 1991, after reviewing medical reports from Dr. Webb, the treating orthopedic surgeon, and Dr. Springmeyer, another orthopedist secured for a second opinion, and work approvals signed by Dr. Webb. This is competent medical evidence. Jim Walter Homes v. Lewis, supra. At the time, the only contrary evidence was Green's own complaints, which were riddled with credibility problems. While we are required to defer to the hearing officer's broad discretion in fact finding, we are again constrained to hold that the evidence available to Con Agra overwhelmingly showed that Green was able to perform the work offered and not in need of further medical treatment. The decision to halt benefits was not, on these facts, arbitrary, capricious or without probable cause. The hearing officer committed manifest error. Rosell v. ESCO, supra. The later reports from Huey P. Long Hospital do not affect Con Agra's decision in November 1991; at any rate, they offer little to disturb the sound medical conclusions of Drs. Webb and Springmeyer.
The award of penalties and attorney fees will be reversed.

Conclusion
For the reasons expressed, the judgment of the hearing officer awarding Green benefits for temporary, total disability, rehabilitation services, additional expenses and mileage, penalties, interest and attorney fees, is reversed at Green's costs. Judgment is rendered dismissing his claim.
REVERSED; CLAIM DISMISSED.
NOTES
[1] The "PM cutter" job involves cutting off the front half of the chicken with a knife. No stooping or carrying is involved; workers usually sit on stools. The procedure is done in "extreme cold." The "Evis" job involves rehanging picked chickens from the table to evisceration shackles. The process entails reaching for the chickens, but can be performed from either a standing or sitting position. The job analysis lists "odors" and no extreme temperatures. Ex. D-2.
[2] Section 1208 has been subsequently amended. See La.Acts 1992, No. 763; La.Acts 1993, No. 829.
[3] At the time, R.S. 23:1226 A provided as follows:

When an employee has suffered an injury covered by this Chapter which precludes the employee from earning wages equal to wages earned prior to the injury, the employee shall be entitled to prompt rehabilitation services. The employer or insurer shall provide such injured employee with appropriate training and education for suitable gainful employment and may utilize programs provided by state and federal agencies for vocational education when conveniently available or may utilize any public or private agency cooperating with such state and federal agencies in the vocational rehabilitation of such injured employee. In the absence of such programs the employer or insurer shall provide vocational rehabilitation with available private agencies.
The statute was amended to its present form by La.Acts 1989, No. 454, a change in the law of which the hearing officer and Green's counsel appear to have been unaware. See Br., 13.
[4] The note reads: "Please begin a rehab program on Mr. Green's right knee 3 × weekly. Dx: Strain, contusion, right knee." This appears to be a request for physical therapy, and is actually initialled by "LB," not the doctor. Dr. Sandifer was not called to testify.